**MARC P. BERGER**
**REGIONAL DIRECTOR**
**Joseph G. Sansone**
**Lara Shalov Mehraban**
**Simona K. Suh**
**Sandeep Satwalekar**
**Ann Marie Preissler**
**Tracy Sivitz**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**(212) 336-5056 (Preissler)**
**Email: preisslera@sec.gov**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | **20 Civ. _____ (      )** |
| **-against-** | |
| **BOAZ MANOR (a/k/a SHAUN MACDONALD), EDITH PARDO (a/k/a EDITH PARDO MEHLER and EDITH MEHLER), CG BLOCKCHAIN, INC., and BCT INC. SEZC (f/k/a BCT Inc.),** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff U.S. Securities and Exchange Commission (the "Commission"), Brookfield Place, 200 Vesey Street, Suite 400, New York, New York 10281, alleges as follows for its Complaint against Defendants Boaz Manor (a/k/a Shaun MacDonald) ("Manor"), Edith Pardo (a/k/a Edith Pardo Mehler and Edith Mehler) ("Pardo"), CG Blockchain, Inc. ("CGB"), and BCT

Inc. SEZC (f/k/a BCT Inc.) ("BCT") (collectively, "Defendants"), whose names and last known addresses are set forth below:

a. Boaz Manor – Ridgewood Road, Toronto, Ontario, Canada M5P 1T4;

b. Edith Pardo – Lackawanna Place, Bloomfield, New Jersey 07003;

c. CG Blockchain, Inc. – 77 Water Street, Unit 700, New York, New York 10005; and

d. BCT Inc. SEZC – c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, Cayman Islands KY1-9010.

## SUMMARY

1.      Between approximately August 2017 and September 2018, Defendants conducted a fraudulent and unregistered offering of digital asset securities, known during most of the relevant time as BCT Tokens (the "Tokens").  Defendants raised at least $30 million from hundreds of investors in the United States and abroad through an initial coin offering ("ICO") of the Tokens, in a purported effort to develop a suite of technology solutions for hedge funds and other traders investing in digital assets.  Defendants raised the funds by engaging in a fraudulent scheme and lying to investors about such material matters as Manor's identity, criminal background, and role in the business; Pardo's role in the enterprise; the composition of their business's management team; and the use of their technology by certain hedge funds.

2.      Specifically, throughout the relevant time, Defendants lied to investors about the identity and criminal background of Manor, who at all relevant times controlled Defendants CGB and BCT (together, the "CGB Entities") and was in all respects the head of the enterprise. Manor used the alias "Shaun MacDonald" during the Token offering to hide his background as a convicted criminal and his involvement in the widely-publicized collapse of a major Canadian hedge fund.  Defendants did not disclose either Manor's true name or his criminal history to investors.

2

3.      In addition to hiding Manor's identity, Defendants further concealed Manor's control over the enterprise by, among other things, misrepresenting to investors that Pardo was the sole owner of the CGB Entities; that Pardo had invested millions of her own funds in the business; that "MacDonald" was merely a consultant who worked for Pardo; and by falsely claiming that the CGB Entities were run by other individuals, including a purported President and "executive team," whose academic and business credentials Defendants repeatedly touted to investors.

4.      In fact, Pardo neither invested millions in the business nor exercised managerial authority over it, and instead acted merely as a front that concealed Manor's true control over the business.  In addition, the purported President of the business did not have significant decision-making authority, and the purported "executive team" consisted of hired consultants who similarly did not exercise senior managerial control.

5.      Defendants also made materially false or misleading statements to investors about the state of the technology products they were developing.  Among other things, Defendants claimed that the CGB Entities had already created technology that was "live in beta" and achieving "high traction" with numerous hedge fund clients.  In reality, although some hedge funds had accepted free shipments of an early prototype of one of the CGB Entities' technology products, the hedge funds neither used nor paid for the technology and in fact accepted the shipments because Defendants had promised each of them assistance in securing up to $200 million of investments into their respective hedge funds, a condition that was never met and was never disclosed to Token investors.

6.     Defendants' offer and sale of the Tokens constituted an illegal offer and sale of securities for which no registration statement was filed with the Commission or was then in effect, and to which no exemption from registration applied.

## VIOLATIONS

7.     By virtue of the foregoing conduct and as alleged further herein, Defendants have violated Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.     In addition, Manor and Pardo aided and abetted the CGB Entities' and each other's violations of Securities Act Sections 5(a), 5(c), and 17(a) and Exchange Act Section 10(b) and Rule 10b-5 thereunder.

9.     Unless Defendants are restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and (d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11.     The Commission seeks a final judgment:  (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge any ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section

21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Manor and Pardo from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) prohibiting Manor and Pardo from participating in any offering of digital asset or other securities pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Securities Act Sections 20(b), 20(d) and 22 [15 U.S.C. §§ 77t(b), 77t(d), and 77v] and Exchange Act Sections 21(d) and 27 [15 U.S.C. §§ 78u(d) and 78aa].

13.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue is proper in this District pursuant to Securities Act Section 22(a) [15 U.S.C. §77v(a)] and Exchange Act Section 27(a) [15 U.S.C. §78aa(a)].  Several victims of Defendants' scheme reside in the District of New Jersey, and Pardo resides in this District and resided in this District during the relevant period.

## DEFENDANTS

15.     **Manor**, age 46, is a resident of Toronto, Ontario, Canada and a dual citizen of Canada and Israel.  Manor was the founder of the CGB Entities and at all relevant times controlled all aspects of the CGB Entities' business.

16. **Pardo**, age 68, is a resident of Bloomfield, New Jersey and an Israeli citizen. Pardo is a licensed attorney in the State of New York. Pardo held the title of director, managing director, and registered agent for the CGB Entities.

17. **CGB**, incorporated in 2016 in New York, has its principal place of business in New York, New York.

18. **BCT**, incorporated in 2018 in the Cayman Islands, has its principal place of business in New York, New York.

## BACKGROUND ON DIGITAL TOKENS OR COINS

19. An ICO is a fundraising event in which an entity offers participants a unique "coin" or "token" issued and distributed on a "blockchain," or cryptographically-secured ledger, in exchange for consideration, often in the form of fiat currency or digital assets, such as cryptocurrency.[1]

20. ICOs are typically announced and promoted through public online channels and promotional events and conferences. To participate, investors are generally required to transfer funds to the issuer's address, online wallet, payment processor, or other account. During or after the completion of the ICO, the issuer distributes its unique coins or tokens to the participants' unique addresses on the blockchain. In some instances, the coins or tokens may continue to be

---

[1] A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

offered and sold by the issuer after the ICO has been completed.  Often the coins or tokens trade in secondary markets.

## FACTS

**I.     Manor Pleaded Guilty to Two Crimes in Canada and Later Assumed False Identities to Conceal His Past**

21.     In 2010, Manor pleaded guilty in Ontario, Canada to the crimes of laundering the proceeds of a crime and disobeying an order of a court.  Both charges related to the 2005 collapse of the hedge fund firm Portus Group ("Portus").  Manor co-founded Portus in 2003 and served as the president, sole shareholder, and director of the firm that managed the hedge fund. At the time of its collapse, Portus was one of the largest hedge funds in Canada.  Legal proceedings concerning the fund's collapse and the criminal action against Manor were widely reported in Canadian news and media outlets.

22.     Following his guilty plea, Manor served approximately one year in prison.

23.     In 2012, pursuant to a settlement, the Ontario Securities Commission ordered Manor to pay disgorgement of CA$8.8 million and banned Manor from serving in a number of roles in the securities industry in Ontario, including, subject to certain exceptions, acquiring and trading securities and becoming or acting as a director or officer of an issuer, registrant, or investment fund manager, or acting as a registrant, investment fund manager, or promoter.

24.     Manor began working on the business that would ultimately become CGB at least one year before Manor and Pardo incorporated CGB in New York State on or about April 25, 2016.  Pardo, who knew Manor's true identity and criminal history at all relevant times, was listed as the incorporator and registered agent for the company.  The main stated goal of the business was to develop ComplianceGuard, a technology intended for hedge funds to record all

of their transactions on a blockchain, which, in turn, was supposed to enable better auditing and fraud prevention.

25.     From the outset, Manor made a point to conceal his true identity and his criminal history in connection with the ComplianceGuard project.  For example, until approximately November 2016, he used a number of aliases, including "Jay Mills" and "Jay Belzberg," in his interactions related to the CGB business.

26.     Manor ultimately settled on the alias "Shaun MacDonald" in or around November 2016.  On or about November 11, 2016, Manor notified Pardo of his adoption of this assumed name by email.

27.     Manor continued to use the MacDonald alias in connection with the CGB Entities' business, including the offer and sale of the Tokens, until approximately September 2018.

## II.     Defendants Raised Over $30 Million from Investors by Selling Digital Asset Securities

28.     In approximately August 2017, Manor, Pardo, and CGB began their efforts to raise funds for the development of ComplianceGuard through the unregistered offer and sale of the Tokens, which they initially named "BBA coins."  Until they were finally named "BCT Tokens" in or around December 2017, the Tokens were offered and sold under various names, including but not limited to the BBA coin and the GUARD coin.

29.     Throughout the entire time period of Defendants' fraudulent offer and sale of the Tokens, ComplianceGuard existed only as an early prototype, a box-shaped device that was not integrated with other trading or compliance systems.  Without such integration, the ComplianceGuard prototype served as an electronic hard drive for digital storage of transaction data, which had to be manually imported onto the device.

30.     In soliciting early investments in the Tokens, Manor, Pardo, and CGB claimed that, once CGB had developed ComplianceGuard and related applications, hedge funds that installed the product would use the Tokens as the medium to pay for ComplianceGuard itself and related CGB products.

31.     Manor, Pardo, and CGB raised approximately $775,000 in initial investments in the fall of 2017.  The Tokens were marketed to both U.S.-based and foreign investors, largely through email circulation of marketing materials that touted the prospects for the price of the Tokens to appreciate.

32.     By approximately mid-November 2017, Manor decided to postpone the remaining phases of the ICO and to change CGB's business plan to focus on the development of the "Blockchain Terminal" (the "Terminal"):  a device for trading in and retrieving information about various types of digital assets, styled after the Bloomberg terminal.  Manor and Pardo formed Defendant BCT, which they incorporated in the Cayman Islands in February 2018 with Pardo as the sole officer and director, and renamed the offered Tokens "BCT Tokens."

33.     In or around January 2018, Defendants renewed their ICO efforts, launching a massive campaign to raise funds through the sale of the Tokens to investors.  Defendants marketed the Tokens using a variety of interstate means, including but not limited to email circulation of marketing materials, BCT's website, YouTube videos, Twitter, Telegram channels and groups, and various crypto conferences and roadshows that took place both within the United States and abroad.

34.     Central to the ICO was Defendants' recruitment of consultants to whom Defendants referred to as "advisors."  These "advisors" were compensated in Tokens, cash advances, or digital currency for assisting Defendants in the administration of the ICO, and also

solicited investors, using the marketing materials prepared under Manor's direction.  Many of the "advisors" were themselves investors in the ICO.

35.     The Tokens were marketed in a manner that led investors reasonably to expect to profit from the efforts of Defendants and the purported management team of the CGB Entities. During all phases of Defendants' offer and sale of the Tokens, both in 2017 and in 2018, prospective investors were told that the CGB Entities would use the ICO proceeds to develop their technology products, including ComplianceGuard and the Terminal; that investors would have the opportunity to profit from the appreciation in the value of the Tokens once those products were fully developed and became widely adopted in the hedge fund industry; and that the expected appreciation of the Tokens would come about in part as a result of the Tokens ultimately becoming the medium through which various users would pay for the CGB Entities' technology products and related services.  On some occasions, these representations included exorbitant, and often highly speculative or entirely baseless, projections of the Tokens' future value.

36.     For example:

    a.     On or about September 5, 2017, Manor emailed a potential investor that "[o]ur demand for coin is based on Hedge Funds based in the U.S. – i.e. the hedge funds' demand causes the Coin value to appreciate."

    b.     Starting in February 2018, representatives of the CGB Entities, at Manor's direction, provided potential investors with written and oral presentations stating that there would be "Continuous BCT Coin Usage" through the "ecosystem" to be created by the CGB Entities' technology.

c.  On or about November 21, 2017, Manor emailed an "advisor" to the CGB Entities that the "institutional grade participation [of the hedge fund industry in the planned technology] is expected to generate significant value appreciation for coin holders."

d.  In December 2017, Manor claimed in a meeting with a potential investor that the Tokens had the potential to appreciate from the projected $20 million in aggregate value at the ICO's planned close in early 2018 to several billion dollars in aggregate value by the end of 2018, and further claimed that he and Pardo planned to cash out by eventually selling their own appreciated Tokens.

37.  Investors executed various types of purchase agreements throughout the offering, including Coin Purchase Forms, Token Purchase Forms, Simple Agreements for Future Tokens ("SAFTs"), and Contribution Agreements, pursuant to which Defendants sold Tokens to be later delivered to investors.

38.  Investors paid for Tokens in fiat currency, Bitcoin ("BTC"), or Ether ("ETH"). Investments made in dollars were directed to and subsequently pooled in an Interest on Lawyers Trust Account ("IOLTA") under the beneficiary name, Edith A. Pardo Mehler Attorney Trust. Large portions of the investments of BTC or ETH were converted to cash and then similarly pooled in the IOLTA. Defendants used an IOLTA in Pardo's name to give the fundraising an aura of trustworthiness.

39.  Each of the Defendants had a direct role in the offer and sale of the Tokens to investors. For example, Manor, posing as "Shaun MacDonald," among other things, directly solicited investors through email communications, phone calls, and in-person meetings held at

the CGB Entities' New York headquarters.  He was also the main conduit of information about the ICO to the CGB Entities' "advisors," who brought in additional potential investors, and he drafted, edited, and authorized the ICO marketing materials.

40.     Pardo, for her part, among other things, signed all of the Token purchase agreements as director of the CGB Entities; met with potential investors and ICO "advisors," often expressing her confidence in the enterprise at such meetings as part of Defendants' Token selling efforts; and attended at least one conference on behalf of the CGB Entities during which the ICO was promoted.  In addition, BCT's website contained links that enabled investors to purchase Tokens, and ICO marketing materials were distributed to potential investors under the names of, and on behalf of, both CGB Entities.

41.     Between August 2017 and September 2018, Defendants raised at least $30 million through Token sales to approximately 275 investors in the United States and more than 450 investors abroad.

42.     Defendants ultimately issued hundreds of millions of Tokens to both domestic and foreign investors between approximately May and September 2018.  Although Defendants initially discussed plans to have the Tokens trade on a digital asset trading platform, and Manor and the CGB Entities told some investors about these plans, the Tokens never traded on a digital asset trading platform.

43.      Moreover, the "ecosystem" for the Tokens' use that Defendants touted to investors never became reality, as none of the Defendants' planned technology products ever became capable of their intended functions.

### III.    Defendants Deceived Token Investors

44.    From August 2017 to early September 2018, in connection with their offer and sale of the Tokens, Defendants lied to investors and engaged in other deceptive devices about multiple material aspects of their enterprise, including Manor's identity, background, and role in the business; Pardo's role at the CGB Entities; the composition of the CGB Entities' management team; and the use of their technology solutions by certain hedge funds.

### A.    Manor's Identity, Background, and Role

45.    At all relevant times, Manor and Pardo concealed from investors Manor's true identity, background, and role through the use of the "Shaun MacDonald" alias and a variety of other deceptive devices.

46.    In their meetings with both prospective and actual investors, conducted on behalf of the CGB Entities, Manor and Pardo routinely and falsely represented that Manor was "Shaun MacDonald," a consultant to Pardo, and concealed from investors, "advisors," and business associates not only Manor's true name and criminal history but also the fact that he controlled all aspects of the business.

47.    During the scheme, Manor employed a number of deceptive devices related to his fake identity and to the concealment of his background and role.

48.    For example, Manor, who appeared clean-shaven with reddish-blond hair in media photographs associated with the Portus scandal, darkened his hair and grew a beard and obtained and used an identification card with the name Shaun MacDonald.

49.    In another example, a fake profile of the fictional "MacDonald" was posted on the website of the public relations firm that Pardo claimed to own, and that she and Manor used to conduct a substantial portion of the CGB Entities' business.  The profile falsely stated that

"MacDonald" was the firm's vice president of business development; that he had "been a contractor for security technology start-ups for over 10 years"; and that he had "coordinated the pre-employment process for technology and security start-ups and growing companies."

50.     Defendants' misrepresentations to investors about Manor's identity, background, and role in the business were material.

51.     Defendants at all relevant times knew or recklessly disregarded that their representations to investors about Manor's identity, background, and role were materially false and misleading.

52.     Manor admitted on or about September 25, 2018 in a video conference meeting with an investor and several "advisors" to the CGB Entities that he did not previously tell the investor his real name and background because that investor would have told others, resulting in "the company being destroyed."

53.     For her part, Pardo admitted in an October 2018 email to a CGB business partner that she had known of Manor's identity and criminal history since CGB's inception, although she continued to falsely claim in that communication that Manor was merely her personal consultant and did not have a substantive role in CGB's business.

**B.     Pardo's Role in the CGB Entities**

54.     Defendants also lied to investors about Pardo' role in the CGB Entities' business and engaged in a variety of deceptive devices to perpetuate those lies.

55.     Both Manor and Pardo, acting on behalf of the CGB Entities, often falsely represented to potential investors that Pardo, an attorney and, they claimed, a wealthy Israeli businesswoman:  (1) was the sole financial backer of the CGB Entities; (2) had invested millions

of her own funds in the business; and (3) as the CGB Entities' director or managing director, had the final say in all major business decisions.

56.     In one example of Defendants' lies about Pardo' role, in or around February 2018, Pardo expressly, and falsely, assured one prospective investor that she would not have invested millions of her own funds in the CGB Entities' business had she thought that the investment was risky.  The investor then purchased $500,000 worth of Tokens from the Defendants.

57.     Throughout the ICO, Defendants made inconsistent and untruthful claims about the size of Pardo's investment in the business.  For example:

  a.      On December 13, 2017, Manor emailed an investor and "advisor," who later referred other investors into the ICO, that Pardo had "already contributed $3m[illion]" to CGB and "intends to contribute more (i.e. via token sale) as token investors join the project";

  b.      In or around March 2018, Manor told a potential investor, who later joined a group of investors that, together, purchased more than $700,000 worth of the Tokens, that Pardo had invested the initial capital of approximately $1 million in the CGB Entities.

58.     Defendants employed a number of other deceptive devices related to Pardo's fictional role in the CGB Entities' business.  For example, Manor and Pardo used bank accounts over which Pardo had signatory authority to funnel to the CGB Entities capital infusions that Manor had secured from a close family member, to create the false impression that Pardo provided these infusions.

59.     In another example, Manor on certain occasions told investors, employees, contractors, and business associates that major business decisions – including employee and

contractor compensation – had to be approved by Pardo.  In reality, all those decisions were made by Manor, and Pardo's provision of written and oral "approvals" for those decisions was a mere deceptive tactic designed to perpetuate the fiction that Pardo, rather than Manor, was in charge of the CGB Entities' business.

60.     Moreover, even though the funds contributed to the CGB Entities by Manor's close family member were sent to bank accounts over which Pardo, and not Manor, had signatory authority, it was Manor, and not Pardo, who directed how the vast majority of those funds would be spent.

61.     At meetings with potential investors, Manor and Pardo often lured investors with claims of Pardo's purported wealth.  On at least one occasion, Manor and Pardo hosted a lavish dinner at an exclusive New York City restaurant for potential investors and individuals who had agreed to act as "advisors" to the CGB Entities.

62.     Defendants also told investors and "advisors" at various times that Manor worked for Pardo as either a consultant, an advisor, a representative of her family office, or an employee of a public-relations firm that Pardo purported to own.  As one example, on or about August 9, 2017, Manor posed as a representative of a "family office" in an email to a potential investor and "advisor," who ultimately organized a syndicate that invested over $200,000 in ETH in the Tokens; Manor later told this individual that the "family" for whom he worked was Pardo.

63.     Defendants' representations to investors about Pardo's investment and role in the CGB Entities' business were materially false and misleading.  In reality, Pardo was not the sole investor in the CGB Entities; she had not invested millions of dollars of her own money in the business; and Manor, not Pardo, had ultimate decision-making authority for the CGB Entities, with Pardo at all times acting as Manor's subordinate.

64.     Defendants' misrepresentations to investors about Pardo's role in the CGB Entities' business were material, as were their related misrepresentations about Manor's purportedly subordinate role.  Among other things, these misrepresentations lent credibility to the CGB Entities' business and fundraising efforts, while also helping Defendants divert investor scrutiny from the fictional "MacDonald."

65.     Defendants at all relevant times knew or recklessly disregarded that their representations to investors about Pardo's role were materially false or misleading.

**C.     CGB Entities' Management**

66.     Defendants also routinely made false or misleading statements to investors and engaged in other deceptive devices related to the composition of the CGB Entities' management team, touting the business and academic credentials of the business's purported "President" and "executive team" even though those individuals in reality had no senior management roles in the business.

67.     In May 2017, Defendants hired Executive A, an individual who had previously served in senior roles in the technology departments of two major financial services firms, to be the stated President of the CGB Entities.

68.     Although Executive A was given the title of "President," in reality, he was subordinate to Manor, who continued to function as the head of the CGB Entities and to exercise final decision-making authority in the business.

69.     Despite Manor's control over the CGB Entities, ICO marketing materials provided to potential investors did not at any point reference either Manor or the fictional "MacDonald" as part of the entities' management team.  Instead, in marketing materials used throughout the ICO, Defendants named Executive A as the head of the "executive team" of the

CGB Entities.  These materials also listed as members of the "executive team" a number of individuals who were described as "groundbreakers and PhDs that provide strategic direction in compliance, government policy and hedge fund law."  These marketing materials were distributed to potential investors both by Manor himself and by his subordinates acting at his direction, under the names of, and on behalf of, both CGB Entities through such varied means as emails, social media, and presentations made at conferences.  The marketing materials were also made available to the public through BCT's website.

70.     The marketing materials' representations about the composition of the CGB Entities' management team were materially false or misleading.  They did not reflect that, in reality, it was Manor, and not Executive A or any of the purported "executive team" members, who headed the business of the CGB Entities and had senior managerial and executive authority over it.  Moreover, these materials did not reflect the fact that the stated "executive team" members were in reality hired consultants with no senior management roles in the enterprise.

71.     Similarly misleading statements about the CGB Entities' management team were also made during in-person meetings with prospective investors that Manor and Pardo hosted.

72.     Manor had ultimate authority over and either drafted, reviewed, revised, or approved all of the marketing materials used in the offering.

73.     Defendants' misrepresentations about the composition of the CGB Entities' management team were material.  Among other things, the business and academic credentials of Executive A and of his purported "executive team" lent credibility to the CGB Entities' business and fundraising efforts and diverted investors' attention and scrutiny from the fictional "MacDonald."

74.     Defendants at all relevant times knew or recklessly disregarded that their descriptions of the CGB Entities' management team were materially false and misleading.

**D.      Use of the CGB Entities' Technology**

75.     Manor and the CGB Entities also made multiple materially false or misleading statements to potential investors about the purported actual use of the CGB Entities' technologies, including ComplianceGuard and the Terminal.

76.     In soliciting investments in the Tokens, Manor and the CGB Entities claimed in numerous written and oral communications to prospective investors that ComplianceGuard was "live in beta with over 20 hedge funds."  Marketing materials for the ICO also described these hedge funds as "actual clients" of the CGB Entities and listed the names of twenty hedge funds that were purportedly using the product.

77.     In 2018, after the CGB Entities pivoted to the Terminal strategy, Manor and the CGB Entities also touted in ICO marketing materials the purported use of ComplianceGuard by the hedge funds as the reason that the Terminal would "launch in 2018," marketing ComplianceGuard as the "foundation of the Blockchain Terminal."

78.     Some of the marketing materials for the Tokens, which were distributed to prospective investors at Manor's direction, also gave the impression that hedge funds were testing or using the Terminal.  For example:

> a.      On or about December 1, 2017, Manor sent an email to an "advisor" attaching a slide deck listing twenty hedge funds and stating, "The BCT beta is live" and "[o]ver 250 hedge funds are on the waitlist";

> b.      In or around February 2018, at Manor's direction, an employee of the CGB Entities emailed to an investor a single page advertisement issued by

"BCT Blockchain Terminal" featuring a large photo of the two-tiered

Terminal display and stating under the heading "ACTUAL CLIENTS"

that "[o]ur live beta is installed at 20 hedge funds";

c.   Between approximately late February 2018 and approximately July 2018,

at Manor's direction, employees and contractors of the CGB Entities

presented at conferences and emailed to potential investors slide decks

containing a slide titled, "Blockchain Terminal," stating "Pilot

Presentation at 20 Hedge Funds."

79.   These statements about the use of ComplianceGuard and the Terminal were

materially false or misleading.

80.   With respect to ComplianceGuard, only about a dozen of the hedge funds listed in

the marketing materials had actually received an early prototype of the device.  None of the

dozen funds who received the prototype actually used the product or provided feedback on its

reliability and efficacy, as suggested by the term "beta testing."  Moreover, the prototype was not

integrated with any trading or compliance systems and functioned as an extra electronic hard

drive for the storage of manually entered transaction data.

81.   In addition, Manor and the CGB Entities did not disclose to investors that the

hedge funds that had received the ComplianceGuard prototype had done so free of charge and

did so because, in return, Manor and Pardo promised them help in securing up to $200 million in

investor assets.  Manor and the CGB Entities also did not disclose to investors that all payments

for ComplianceGuard by the hedge funds were initially waived, and that any future payments

were contingent on the Defendants securing the promised investor assets, a condition that was

never met.

82.     With respect to the Terminal, the device was not at any point installed at 20 hedge funds.

83.     The misrepresentations and omissions alleged above about actual clients' use of the CGB Entities' products were material.  Among other things, the purported actual use of ComplianceGuard and the Terminal by clients lent credence to Defendants' claims about the potential for the offered Tokens to appreciate in value and generate substantial profits for investors down the road, once these technologies were further developed and more widely adopted.

84.     Manor and the CGB Entities at all relevant times knew or recklessly disregarded that their statements about the actual use of the CGB Entities' technology by "actual clients" were materially false or misleading.

## IV.     Defendants' Offers and Sales of the Tokens Were Illegal Unregistered Offers and Sales of Securities

85.     No registration statement was filed or in effect with respect to Defendants' offers and sales of the Tokens, which were securities, and no exemption from registration was available.

86.     Defendants at certain times invoked the provisions of Regulation D promulgated under the Securities Act, including by filing with the Commission, on behalf of BCT, on or about June 28, 2018, a Form D, Notice of Exempt Offering of Securities, pursuant to the Securities Act, citing the provisions of Rule 506(c) of Regulation D as the applicable registration exemption.

87.     But that exemption was not available, among other things, because some of the Token purchasers were not accredited investors, and also because Defendants failed to take reasonable steps to verify whether all of the Token purchasers were accredited investors as

defined in Rule 501 of Regulation D.  [17 C.F.R. § 230.506(c)(1) & (2)].  For example, at various times Defendants offered and sold the Tokens to some investors without checking their accreditation status at all.

### FIRST CLAIM FOR RELIEF
**Violations of Securities Act Section 17(a)**
**(All Defendants)**

88.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 87.

89.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

90.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
**Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(All Defendants)**

91.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 87.

92.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

93.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of Securities Act Sections 5(a) and 5(c)**
**(All Defendants)**

94.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 87.

95.     Defendants, directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails

to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

96.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, violated, and unless enjoined, will again violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and (c)].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Securities Act Sections 5(a), 5(c), and 17(a) and Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Manor and Pardo)**

97.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 87.

98.     As alleged above, Manor, Pardo, CGB, and BCT violated Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

99.     Manor and Pardo knowingly or recklessly provided substantial assistance to each other, CGB, and BCT with respect to their violations of Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

100.     By reason of the foregoing, Manor and Pardo are liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] and Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting each other's, CGB's, and BCT's violations of Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and unless enjoined, will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final

Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys

and all persons in active concert or participation with any of them from violating, directly or

indirectly, Securities Act Sections 5(a), 5(c) and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)]

and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5];

### II.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly,

with prejudgment interest thereon, as a result of the alleged violations;

### III.

Ordering Defendants to pay civil monetary penalties pursuant to Securities Act Section

20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently prohibiting Manor and Pardo from serving as an officer or director of any

company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C.

§ 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)],

pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2)

[15 U.S.C. § 78u(d)(2)];

## V.

Permanently prohibiting Manor and Pardo from participating in any offering of digital

assets or other securities pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; and

## VI.

Granting any other and further relief as the Court may deem just and proper.

Dated: New York, New York
      January 17, 2020

MARC P. BERGER*
REGIONAL DIRECTOR
Joseph G. Sansone*
Lara Shalov Mehraban *
Simona K. Suh*
Sandeep Satwalekar *
Tracy Sivitz*
Ann Marie Preissler*
Attorneys for Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-5056 (Preissler)
Email:  preisslera@sec.gov

* Not admitted in District of New Jersey

**LOCAL RULE 11.2 CERTIFICATION**

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged against the

Defendants in the foregoing Complaint is not the subject of any other civil action pending in any

court, or of any pending arbitration or administrative proceeding.

MARC P. BERGER
REGIONAL DIRECTOR
Counsel for Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-5056 (Preissler)
Email: preisslera@sec.gov

Of Counsel:
Simona K Suh
Sandeep Satwalekar
Tracy Sivitz
Ann Marie Preissler

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Civil Rule 101.1(f), the undersigned hereby designates the United

States Attorney's Office for the District of New Jersey to receive service of all notices or papers

in this action at the following address:

> David E. Dauenheimer
> United States Attorney's Office
> Deputy Chief, Government Fraud Unit
> District of New Jersey
> 970 Broad Street, Suite 700
> Newark, NJ 07102

> SECURITIES AND EXCHANGE COMMISSION
>
> _____
> MARC P. BERGER
> REGIONAL DIRECTOR
> Brookfield Place
> 200 Vesey Street, Suite 400
> New York, New York 10281-1022
> (212) 336-5056 (Preissler)
> preisslera@sec.gov

Of Counsel:
Simona K Suh
Sandeep Satwalekar
Tracy Sivitz
Ann Marie Preissler